# EXHIBIT B

SCOTT N. SCHOOLS, SC 9990
United States Attorney
JOANN M. SWANSON, CSBN 88143
Assistant United States Attorney
Chief, Civil Division
EDWARD A. OLSEN, CSBN 214150
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102
     Telephone: (415) 436-6915
     FAX: (415) 436-6927

PETER D. KEISLER
United States Department of Justice
Assistant Attorney General, Civil Division
DAVID KLINE
Principal Deputy Director
Office of Immigration Litigation
ELIZABETH J. STEVENS VSBN 47445
Trial Attorney
Office of Immigration Litigation
JEFFREY S. ROBINS NY SBN 4355244
Trial Attorney

     P.O. Box 878, Ben Franklin Station
     Washington, D.C. 20044
     Telephone: (202) 616-1246
     FAX: (202) 233-0397
     Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| YINAN ZHANG, et al., | ) No. C-07-0503-SBA |
| | ) |
|      Plaintiffs, | ) **DEFENDANTS' NOTICE OF MOTION** |
| | ) **AND MOTION TO DISMISS; AND** |
|      v. | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES** |
| ALBERTO R. GONZALES, et al., | ) |
| | ) Date: July 31, 2007 |
|      Defendants. | ) Time: 1:00 p.m. |
| | ) Courtroom: 3 |

Defendants' Motion to Dismiss - C-07-0503-SBA

## <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 3

I.      LEGAL AUTHORITY .................................................................................................. 3

      A.      Authority To Naturalize Aliens ................................................................. 3

      B.      Statutory Requirement to Conduct Background Investigations. ................ 4

II.     ARGUMENT ................................................................................................................ 6

      A.      The Court Should Dismiss For Lack Of Jurisdiction, Or Alternatively
              Should Remand the Individual Plaintiffs' Claims To USCIS. ................... 7

            1.      The Court Lacks Jurisdiction Under 8 U.S.C. § 1447(b) Because
                  The Naturalization Examinations Have Not Been Completed. ...... 7

            2.      Alternatively, The Court Should Remand The Individual Plaintiffs'
                  Claims To USCIS Because The Court May Not Grant Citizenship
                  Without The Benefit Of A Full And Complete Background
                  Investigation. .............................................................................. 10

            3.      Plaintiffs' Claims Are Improperly Joined. ................................... 12

      B.      Plaintiffs Have Failed to State a Claim for Which Relief Can be Granted
              Pursuant to the Administrative Procedures Act ....................................... 12

            1.      Plaintiffs Cannot Seek Judicial Review Under The APA Because
                  8 U.S.C. § 1447(b) Is The Only Statute Under Which Such A
                  Claim Can Be Asserted, And It Provides An Adequate Remedy In
                  A Court. ...................................................................................... 13

            2.      Plaintiffs Cannot Seek Judicial Review Under The APA Because
                  Defendants' Actions Are Not "Final Agency Actions" ............... 14

            3.      Plaintiffs Cannot Seek Judicial Review Under The APA Where
                  Defendants' Actions Are Not Legally Required ......................... 14

            4.      The FBI's Procedures Do Not Violate the APA. ......................... 17

      C.      USCIS's Longstanding Investigation Requirements Do Not Violate The
              APA's Notice-and-Comment Requirements ............................................ 18

      D.      The Court Should Dismiss The Request For Injunctive Relief. .............. 20

i

   E.  The Court Should Dismiss Plaintiffs' Due Process Claim Because Plaintiff
      Does Not Assert A Protected Interest ...................................................... 21

CONCLUSION ................................................................................................................ 22

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Abend v. MCA, Inc.,
863 F. 2d 1465, 1478 (9th Cir. 1988) ........................................................................ 19, 20

Alcaraz v. Block,
746 F.2d 593 (9th Cir. 1984) .................................................................................. 18

Alkenani v. Barrows,
356 F. Supp. 2d 652 (N.D. Tex. 2005) ...................................................... 9, 11, 15

Amoco Prod. Co. v. Vill. Of Gambell, Alaska,
480 U.S. 531, 542 (1987) .................................................................................. 20

Aslam v. Gonzales,
2006 U.S. Dist. LEXIS 91747 (W.D. Wash. 2006) ...................................... 11

Astafieva v. Gonzales,
2007 U.S. Dist. LEXIS 5906 (N.D. Cal. 2007) ........................................ 10, 11

Auer v. Robbins,
519 U.S. 452, 461 (1997) ................................................................................. 7

Bennett v. Spear,
520 U.S. 154 (1997) ..................................................................................... 14

Board of Regents v. Roth,
408 U.S. 564, 569 (1972) .............................................................................. 21

Conley v. Gibson,
355 U.S. 41, 45-46 (1957) .............................................................................. 6

Chevron U.S.A., Inc. V. Natural Resources Defense Council, Inc.,
467 U.S. 837, 842-43 (1984) ........................................................................... 8

Coughlin v. Rogers,
130 F.3d 1348 (9th Cir. 1997) ..................................................................... 12

Damra v. Chertoff,
2006 WL 1786246 (N.D. Ohio 2006) ............................................................. 9

Danilov v. Aguirre,
370 F.Supp. 2d 441, 443-44 .................................................................... 9, 13

iii

Edmonds v. Hammett,
    450 F.3d 917, 919 (9th Cir.) ............................................................. 8

El-Daour v. Chertoff,
    417 F. Supp. 2d 679 (W.D. Pa. 2005) ...................................... 10, 11

El-Kassemi v. DHS,
    2006 WL 2938819 (D. N.J.) ............................................................. 9

Essa v. U.S. Citizenship & Immigration Serv.,
    2005 U.S. Dist. LEXIS 388803 (D. Minn. 2005) ......................... 11

FDIC v. Herderson,
    940, F.2d 465, 475 (9th Cir. 1991) ................................................. 22

Friends of the Earth Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
    528 U.S. 167, 192 (2000)................................................................20

Federenko v. U.S.
    449 U.S. , 490 506 (1981) ............................................................. 20

Gunderson v. Hood,
    268 F.3d 1149 (9th Cir. 2001) ....................................................... 18

Haig v. Agee,
    453 U.S. 280 (1981) ....................................................................... 16

In re Barr Lab.,
    930 F.2d 72 (D.C. Cir. 1991) ......................................................... 17

Inmates of Attica Correctional Facility v. Rockefeller,
    342, F.2d 375, 380 (2d Cir. 1973)..................................................16

INS v. Aguirre-Aguirre,
    526 U.S. 415 (1999) ....................................................................... 11

Jarrett v. Roser,
    426 F.2d 213 (9th Cir. 1970) ......................................................... 13

League of Wilderness Defenders/ Blue Mts. Biodiversity Project v. Forsgren,
    309 F. 3d 1181, 1183 (9th Cir. 2002) ............................................. 8

Liberty Fund, Inc. v. Chao,
    394 F. Supp. 2d 105 (D.D.C. 2005) ....................................... 17, 18

Linoz v. Heckler,
    800 F.2d 871 (9th Cir. 1986) ............................................................. 18

Martinez v. Gonzales,
    463,F Supp. 2d 569, 572-3 (N.D. Va. 2006) ............................... 9, 10

Mashpee Wampanoag Tribal Council, Inc. v. Norton,
    336 F.3d 1094 (D.C. Cir. 2003) ...................................................... 17

Monahan v. Dorchester Counseling Center, Inc.,
    961 F.2d 987 (1st Cir.1992) ............................................................ 15

Mustafa v. Pasquerell,
    2006 WL 488399 (W.D. Tex. 2006) .............................................. 16

Norton v. Southern Utah Wilderness Alliance,
    542 U.S. 55 (2004) ......................................................................... 14

Nunez v. City of Los Angeles,
    147 F.3d 867, 871 (9th Cir. 1988) .................................................. 21

Ohio Adult Parole Authority v. Woodard,
    523 U.S.  272, 280 n.2 (1998) ....................................................... 22

Olim v. Wakinwkona,
    461 U.S. 238, 250 (1983) ............................................................... 22

Orantes- Hernandes v. Thornburgh,
    919 F. 2d 549, 558 (9th Cir. 1990) ................................................ 20

Oregon Natural Desert Ass'n v. U.S. Forest Service,
    465 F.3d 977 (9th Cir. 2006) .......................................................... 17

Powderly v. Schweiker,
    704 F.2d 1092 (9th Cir. 1983) ........................................................ 18

Rivera v. Becerra,
    714 F.2d 887 (9th Cir. 1983) .......................................................... 19

Roberts v. Corruthers,
    812, F.2d. 1173, 1177 (9th Cir. 1987) .............................................. 6

Roberts v. Spaulding,
    783 F.2d 867, 870 (9th Cir. 1986) .................................................. 21

San Francisco Baykeeper v. Whitman,
    297 F.3d 877 (9th Cir. 2002) ........................................................ 14

Shalabi v. Gonzales,
    2006 WL 3032413 (E.D. Mo. Oct. 23, 2006) ................................. 16

Shomberg v. United States,
    348 U.S. 540 (1955) ........................................................................ 3

Skelly Oil Co. v. Phillips Petroleum Co.,
    339 U.S. 667 (1950) ...................................................................... 13

Stock West Inc. v. Confederated Tribes,
    873F. 2d 1221, 1225 (9th Cir. 1989) .............................................. 6

Telecomm. Research Action Ctr. v. FCC,
    750 F.2d 70 (D.C. Cir. 1984) ........................................................ 17

Thornhill Pub'g Co. v. Gen. Tel. & Elecs. Corp.,
    594, F.2d 730, 733 (9th Cir. 1999) ................................................. 6

Toyomkina v. Gonzalez,
    2006 U.S. Dist. LEXIS 80845 (W.D. Wash. 2006) ...................... 11

United States v. Fausto,
    484 U.S. 439 (1988) ...................................................................... 13

United States v. Ginsburg,
    243 U.S. 472, 475 (1917) .......................................................... 20, 22

United States v. Cox,
    342 F. 2d 167, 190 (5th Cir. 1965) .............................................. 16

United States v. Hovsepian,
    359 F. 3d. 1144, 1161 (9th Cir. 2004) ............................................ 8

United States v. Mead Corp.,
    533 U.S. 218 (2000) ........................................................................ 8

United States v. Am. Trucking Ass'ns,
    310 U.S. 534, 543 (1940) ................................................................ 9

United States v. Ramos,
    933 F.2d 968 (11th Cir. 1991) ...................................................... 16

Valdez v. Rosenbaum,
  32 F.3d 1039, 1045 (9th Cir. 2002) ........................................................................ 21, 22

Vermont Yankee Nuclear Power Corp. v. NRDC,
  435 U.S. 519, 543 (1978) ................................................................................................ 8

Walker v. Schmoke,
  962 F. Supp. 732, 733 (D. Md. 1997) .......................................................................... 16

Walters v. Reno,
  143 F.3d 1032, 1048 (9th Cir. 1998) ............................................................................ 20

W. Watersheds Project v. Matejko,
  468 F.3d 1099 (9th Cir. 2006) ...................................................................................... 14

Weinberger v. Romero-Barcelo,
  456 U.S. 305, 326-24 (1982) ........................................................................................ 20

Whitman v. Am. Trucking Ass'n,
  531 U.S. 457 (2001) ...................................................................................................... 14

Yang v. California Dept. of Social Services,
  183 F.3d 953 (9th Cir. 1999) ........................................................................................ 15

Zimmerman v. City of Oakland,
  255 F.3d 734, 737 (9th Cir. 2001) .................................................................................. 6

Zemel v. Rusk,
  381 U.S. 1, 11 (1965) .................................................................................................... 17

**STATUTES**

**Immigration and Nationality Act of 1952; as amended:**

Section 101(a)(24),
  8 U.S.C. § 1101 (a)(24) .................................................................................................. 3

Section 101(f),
  8 U.S.C. § 1101 (f) ......................................................................................................... 5

Section 103(a)(3),
  8 U.S.C. § 1103 (a)(3) .................................................................................................... 8

Section 310,
    8 U.S.C. § 1421 ........................................................................................ 3

Section 310(a),
    8 U.S.C. § 1421(a) ................................................................................. 3, 4

Section 310(b)(1),
    8 U.S.C. § 1421(b)(1) ............................................................................... 4

Section 310(c),
    8 U.S.C. § 1421(c) ............................................................................... 4, 12

Section 316(a)(3),
    8 U.S.C. § 1427(a)(3) ................................................................................ 5

Section 334,
    8 U.S.C. § 1445 ........................................................................................ 3

Section 334(b),
    8 U.S.C. § 1445(b) .................................................................................... 3

Section 335(a),
    8 U.S.C. § 1446(a) ........................................................................... 4, 5, 19

Section 335(b),
    8 U.S.C. § 1446(b) .................................................................................... 3

Section 335(c),
    8 U.S.C. § 1446(c) .................................................................................... 3

Section 335(d),
    8 U.S.C. § 1446(d) .................................................................................. 21

Section 336,
    8 U.S.C. § 1447 ........................................................................................ 3

Section 336(a),
    8 U.S.C. § 1447(a) .................................................................................... 4

Section 336(b),
    8 U.S.C. § 1447(b) .......................................................................... _passim_

Section 337,
    8 U.S.C. § 1448 ........................................................................................ 3

8 U.S.C. § 1571(b) ........................................................................................ 15

## Declaratory Judgement Act

28 U.S.C. § 2201 .......................................................................................... 13

## Homeland Security Act of 2002

Section 1512(d) ............................................................................................. 4

## Intelligence Reform and Terrorism Prevention Act of 2004

Section 3001(g) ............................................................................................. 16

## Immigration Act of 1990

Section 104 .................................................................................................... 3

Section 401 .................................................................................................... 4

## Administrative Procedures Act

5 U.S.C. § 553(b)(3) ..................................................................................... 18

5 U.S.C. § 704 ............................................................................................... 13

5 U.S.C. § 706(1) .......................................................................................... 14

## <u>OTHER STATUTES</u>

Pub. Law 105-515, 104 Stat. 2101, 2112 (1990) ........................................ 17

Pub. L. No. 105-119, Title I, 111 Stat. 2448 (Nov. 26, 1997) ............................ <u>passim</u>

## <u>REGULATIONS</u>

8 C.F.R. § 312.1 ............................................................................................ 10

8 C.F.R. § 312.5 ............................................................................................ 10

8 C.F.R. § 334.11 .......................................................................................... 3

8 C.F.R. § 335. ................................................................................................... 21

8 C.F.R. § 335.1 ............................................................................................. 15, 19

8 C.F.R. § 335.2(a) .............................................................................................. 9

8 C.F.R. § 335.2(b) ...................................................................................... passim

8 C.F.R. § 335.6 .................................................................................................. 9

8 C.F.R. § 335.11 ................................................................................................ 3

8 C.F.R. § 335.13 ................................................................................................ 3

8 C.F.R. § 336.2(b) ............................................................................................. 4

1    **PLEASE TAKE NOTICE** that on July 31, 2007, at 1:00 p.m. or as soon thereafter as the

2    parties may be heard, Defendants David Still, Emilio T. Gonzalez, Michael Chertoff, Robert S.

3    Mueller III, and Alberto Gonzales (collectively "Defendants" or "Government") will bring for

4    hearing a motion to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and

5    (6).  The hearing will take place before the Honorable Saundra Brown Armstrong, in Courtroom 3,

6    1301 Clay St., Oakland, CA 94612.

7        This Motion is based on the Memorandum of Points and Authorities attached hereto, the

8    Declaration of Michael A. Cannon, all pleadings, papers and files in this action, and such oral

9    argument as may be presented at the hearing on the motion.

10                                              Respectfully submitted,

11

12                                              SCOTT N. SCHOOLS
                                                United States Attorney
13                                              JOANN M. SWANSON
                                                Assistant United States Attorney
14                                              Chief, Civil Division
                                                EDWARD A. OLSEN
15                                              Assistant United States Attorney

16
                                                PETER D. KEISLER
17                                              United States Department of Justice
                                                Assistant Attorney General, Civil Division
18                                              DAVID KLINE
                                                Principal Deputy Director
19                                              Office of Immigration Litigation
                                                ELIZABETH J. STEVENS
20                                              Trial Attorney

21
     Dated: April 30, 2007            By:    /s/
22   _____    JEFFREY S. ROBINS
                                                Trial Attorney
23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants David Still, Emilio T. Gonzalez, Michael Chertoff, Robert S. Mueller III, and Alberto Gonzales (collectively "Defendants" or "Government"), by and through their undersigned counsel, respectfully move this Court for an Order dismissing Plaintiffs' Complaint because the Court lacks subject matter jurisdiction over Plaintiffs' claims and the Complaint fails to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(1), (6).  Alternatively, Defendants request that the Court remand this matter to the United States Citizenship and Immigration Services ("USCIS"), pursuant to 8 U.S.C. § 1447(b).  This Motion is based on the supporting declaration of Michael Cannon ("Cannon Decl.") attached hereto as Exhibit 1.

## I.  LEGAL AUTHORITY

### A.  Authority To Naturalize Aliens.

Until 1990, United States District Courts sat as naturalization courts and were vested with exclusive jurisdiction to pass upon the qualifications of an applicant for naturalization and to naturalize aliens as citizens of the United States.  *See* 8 U.S.C. §§ 1101(a)(24), 1421(a) (repealed 1990); *see also Shomberg v. United States*, 348 U.S. 540 (1955).  Under this two-tiered system, the applicant submitted a preliminary naturalization application to the then Immigration and Naturalization Service ("INS"), which conducted a preliminary investigation of the applicant, and made a non-binding recommendation to the district court as to whether the  application should be approved or denied.  *See* 8 U.S.C. §§ 1445(b), 1446(b)&(d) (repealed 1990); 8 C.F.R. §§ 334.11, 335.11-335.13 (1990).  The actual decision to approve or deny the naturalization application was vested solely with the federal court, which took jurisdiction based on a petition filed by the applicant and administered the oath of allegiance.  *See* 8 U.S.C. §§ 1421, 1445, 1447, 1448 (repealed 1990).

In 1990, Congress enacted the Immigration Act of 1990, Pub. L. No. 101-649, § 401, 104 Stat. 4978 ("IMMACT"), which overhauled the naturalization process in favor of a one-tier administrative procedure.  The central purpose for this shift to an administrative naturalization process from a judicial one was to reduce the waiting time for eligible naturalization applicants, who encountered unwarranted delays because of the two-tiered process.  *See* 135 Cong. Rec. H4539-02 (July 31, 1989).

Under Section 401 of IMMACT, Congress transferred the power to naturalize from the district courts and vested the Attorney General – now the Secretary of DHS[1] – with "sole authority to naturalize persons as citizens of the United States." *See* INA § 310(a); 8 U.S.C. § 1421(a). Under the administrative naturalization process, USCIS is responsible for adjudicating naturalization applications, including rendering a preliminary investigation of the applicant, interviewing and if necessary subpoenaing witnesses, conducting an examination, and making a determination as to whether to grant or deny the application. *See* INA § 335(a),(b),(c); 8 U.S.C. § 1446(a),(b),(c). If USCIS initially denies a naturalization application, the applicant may seek administrative review of the denial by requesting a hearing before a supervisory immigration officer. INA § 336(a); 8 U.S.C. § 1447(a); 8 C.F.R. § 336.2(b).

Although vesting the primary naturalization authority with the Secretary of DHS, Congress did not completely eliminate district court jurisdiction over the naturalization application process. District courts may still administer the citizenship oath of allegiance. *See* INA § 310(b)(1); 8 U.S.C. § 1421(b)(1). District courts also have jurisdiction to review *de novo* applications for naturalization denied as a result of the administrative review procedure under INA § 336(a); 8 U.S.C. § 1447(a). *See* INA § 310(c), 8 U.S.C. § 1421(c).

Finally, under INA § 336(b), 8 U.S.C. § 1447(b), the provision at issue here, the applicant may apply to the appropriate district court for a hearing on the naturalization application if USCIS does not grant or deny the application by "the end of the 120-day period after the date on which the examination is conducted under such section." In such a case, the court "may either determine the matter or remand the matter, with appropriate instructions, to [USCIS] to determine the matter." INA § 336(b), 8 U.S.C. § 1447(b).

**B. Statutory Requirement to Conduct Background Investigations.**

In all petitions or applications for immigration services or benefits, USCIS conducts security checks in order to enhance national security, public safety, and to ensure the integrity of

---

[1] The transfer of the former INS's naturalization functions to the newly-created DHS included the transfer of the authority to naturalize from the Attorney General to the Secretary of DHS. *See* Homeland Security Act of 2002, Pub. L. No.107-296, § 1512(d), 116 Stat. 2135, 2310.

1 the immigration process. Before USCIS is permitted to adjudicate any Form N-400 naturalization

2 application, a full background investigation of the applicant must be completed.

3 In 1997, Congress mandated that the former INS "receiv[e] confirmation from the Federal

4 Bureau of Investigation that a full criminal background check has been completed, except for those

5 excepted by regulation as of January 1, 1997," before adjudicating a naturalization application.

6 Pub. L. No. 105-119, Title I, 111 Stat. 2448 (Nov. 26, 1997).

7 Consistent with this congressional mandate, the relevant statutory and regulatory provisions

8 require the Executive Branch to thoroughly investigate the background of every applicant for

9 citizenship in order to determine whether that applicant is eligible to be naturalized. *See* INA

10 § 335(a), (b), 8 U.S.C. § 1446(a), (b); *see also* 8 C.F.R. § 335.1 (2004). These regulations provide

11 that:

> Subsequent to the filing of an application for naturalization, the Service shall conduct
> an investigation of the applicant. The investigation shall consist, at a minimum, of a
> review of all pertinent records, police department checks, and a neighborhood
> investigation in the vicinities where the applicant has resided and has been employed,
> or engaged in business, for at least the five years immediately preceding the filing of
> the application . . . .

15

16 8 C.F.R. § 335.1 (2004). The regulations also specify that citizenship applicants are to be

interviewed only after a full background check has been completed. *See* 8 C.F.R. § 335.2(b) (2006).

17

18 A full and complete background check is part of the inquiry into whether an applicant

19 possesses good moral character. *See* INA § 316(a)(3), 8 U.S.C. § 1427(a)(3). The existence of a

20 criminal background is one of the primary means to appraise an alien's moral character. An alien

21 cannot establish good moral character if he or she was convicted of certain criminal offenses,

including crimes involving moral turpitude. *See* INA § 101(f), 8 U.S.C. § 1101(f).

22

23 Further, USCIS conducts several forms of security and background checks on citizenship

24 applicants to ensure they are not a risk to national security or public safety. These background

25 checks include a record check of the alien made against the Department of Homeland Security's

26 ("DHS") own immigration data systems; an FBI background/fingerprint check for relevant criminal

27 history records on the alien (e.g., arrests and convictions); and a national security check, which is

run against databases containing information that is not necessarily revealed by the FBI's fingerprint

28 check. *See* USCIS Fact Sheet, Immigration Security Checks - How and Why the Process Words,

1   Ex. 2.  Often, these law enforcement checks reveal significant derogatory information pertaining to

2   applicants for immigration benefits, including applicants seeking naturalization, which result in the

3   alien being found ineligible for naturalization and other benefits.  *Id.*

4        In those applications for which FBI name checks remain pending, USCIS cannot adjudicate

5   Plaintiffs' Applications for Naturalization until USCIS receives the name check results because

6   USCIS must verify that each Plaintiff has established the good moral character requirement of

7   naturalization, that he or she is not statutorily barred from naturalization, and that he or she has not

8   committed or been convicted of certain criminal offenses, including crimes involving moral

9   turpitude, which would also bar naturalization.

10       Where FBI name checks have been completed, USCIS must evaluate the FBI name check

11  result, determine whether each Plaintiff has established the good moral character requirement of

12  naturalization, that he or she is not statutorily barred from naturalization, and that he or she has not

13  committed or been convicted of certain criminal offenses, including crimes involving moral

14  turpitude, which would also bar naturalization.

15                **II. ARGUMENT**

16       This Court should dismiss Plaintiffs' First Amended Complaint for Declaratory and

17  Injunctive Relief and Petition for Naturalization Pursuant to 8 U.S.C. § 1447(b) because this Court

18  lacks subject matter jurisdiction over Plaintiff's claims. Fed. R. Civ. P. 12(b)(1). Plaintiffs have the

19  burden of establishing the jurisdiction of this Court. *See Stock West, Inc. v. Confederated Tribes*,

20  873 F.2d 1221, 1225 (9th Cir. 1989) (noting that a federal court is presumed to lack subject matter

21  jurisdiction until the contrary affirmatively appears). Even where a plaintiff's pleadings are

22  technically sufficient to establish some basis of jurisdiction, a Rule 12(b)(1) motion may also allege

23  that there is an actual lack of jurisdiction. *See, e.g.*, *Thornhill Publ'g Co. v. Gen. Tel. & Elecs.*

24  *Corp.*, 594 F.2d 730, 733 (9th Cir. 1979); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.

25  1987). In addition, dismissal for failure to state a claim under Rule 12(b)(6) is appropriate if it

26  "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

27  would entitle him to relief." *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001)

28  (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Because defendants challenge the

1 jurisdiction of the Court, a motion to dismiss under Rule 12 is appropriate.[2]

2     **A. The Court Should Dismiss For Lack Of Jurisdiction, Or Alternatively Should**
3     **Remand the Individual Plaintiffs' Claims To USCIS.**

    **1. The Court Lacks Jurisdiction Under 8 U.S.C. § 1447(b) Because The**
4     **Naturalization Examinations Have Not Been Completed.**

5     The Court cannot exercise jurisdiction over Plaintiffs' claims because the statutory requisites

6 for jurisdiction under 8 U.S.C. § 1447(b) have not been met, making this case unripe for review.  In

7 the alternative, this Court should remand Plaintiffs' individual claims to USCIS for further

8 processing in light of the need to complete background checks before naturalization determinations

9 can be made.

10     Pursuant to 8 U.S.C. § 1447(b), a naturalization applicant may apply for a hearing before the

11 District Court.  The court "may either determine the matter or remand the matter, with appropriate

12 instructions, to the Service to determine the matter," if USCIS fails to adjudication the

13 naturalization application 120 days after the examination was conducted.  8 U.S.C. § 1447(b).

14 Plaintiffs claim this Court has jurisdiction over their naturalization applications because more than

15 120 days have elapsed since each of them was initially interviewed by USCIS, regardless of the fact

16 that their background checks have not been completed.  Plaintiffs also claim this Court has authority

17 to grant their naturalization application and to naturalize them thereafter.  *See* Plaintiffs' First

18 Amended Complaint for Declaratory and Injunctive Relief and Petition for Naturalization Pursuant

19 to 8 U.S.C. § 1447(b), 23:7, 9.

20     While courts are divided on the question, the Government believes that a reasonable

21 interpretation of 8 U.S.C. § 1447(b) is that the 120-day period starts when the full examination

22 process is completed, the initial interview being only one of the components to the naturalization

23 process.  This interpretation is supported by the plain language of both the statue and regulations,

24 USCIS's interpretation of the statute and regulations, and congressional intent.  Morever, this

25 interpretation has been recognized by other jurisdictions addressing the same issues presented by the

26

27

28     [2] Defendants' declarations assist the Court in determining whether plaintiffs have indeed
provided sufficient factual allegations to support their assorted claims.  The affidavits provide
factual support regarding defendant's reasonable interpretation of the examination process, and
the parameters of that process.

1 present case.[3]

2       The Court should give deference to the agency's interpretation of the statute and of its own

3 regulations.  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43

4 (1984) (court must defer to agency's reasonable interpretation of ambiguous statute that agency is

5 charged with enforcing); *Edmonds v. Hammett*, 450 F.3d 917, 919 (9th Cir. 2006) (citing *Auer v.*

6 *Robbins*, 519 U.S. 452, 461 (1997)); *League of Wilderness Defenders/Blue Mts. Biodiversity*

7 *Project v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002) ("An agency's interpretation of its own

8 regulations is entitled to deference unless it is plainly erroneous or inconsistent with the

9 regulation[.]").  Where Congress has authorized the Secretary of Homeland Security to "establish

10 such regulations . . . and perform such other acts . . . as he deems necessary for carrying out his

11 authority under the provisions of this Act," 8 U.S.C. § 1103(a)(3), then USCIS's interpretation of

12 "examination" should be afforded *Chevron* deference.  *See United States v. Mead Corp*., 533 U.S.

13 218 (2000) ("administrative implementation of a particular statutory provision qualified for

14 *Chevron* deference when it appears that Congress delegated authority to the agency generally to

15 make rules carrying the force of law and that the agency interpretation claiming deference was

16 promulgated in the exercise of that authority").  USCIS recently restated its interpretation that

17 "examination" in Section 1447(b) is a process and does not to occur at the interview of the

18 applicant. *See* Clarification Regarding Notice to Naturalization Applicants, Michael L. Aytes,

19 March 23, 2007, Exhibit 3.  This Court should give deference to USCIS's interpretation of its own

20 statute and regulations, and dismiss Plaintiffs' action.  *See Vermont Yankee Nuclear Power Corp. v.*

21 *NRDC*, 435 U.S. 519, 543 (1978) (emphasizing that an administrative agency "should be free to

22 fashion [its] own rules of procedure and to pursue methods of inquiry capable of permitting [it] to

23 discharge [its] multitudinous duties).

24       USCIS's interpretation is supported by a plain reading of the regulations governing 8 U.S.C.

25

26       [3]  While the United States Court of Appeals for the Ninth Circuit appears to have
previously found that the 120-day period began on the date of the "INS's initial interview of the
27 applicant," *United States v. Hovsepian*, 359 F.3d 1144, 1161 (9th Cir. 2004), the Ninth Circuit
made that determination without considering the statutory language requiring an examination
28 rather than merely an interview, the relevant regulations, nor the former INS's interpretation of
the term "examination."

1  § 1447(b), that make clear that an "examination" is not a single event, but a process USCIS must

2  follow to gather information concerning the applicant.  Pursuant to 8 C.F.R. § 335.2(a), the

3  examination shall be "uniform throughout the United States and shall encompass all factors relating

4  to the applicant's eligibility for naturalization."  8 C.F.R. § 335.2(a) (emphasis added).  It is evident

5  from the regulations that an examination should encompass "all factors" having to do with an

6  applicant's background, including, but not limited to the results of a full background check (*see* 8

7  C.F.R. § 335.2(b)), and the alien's participation in an oral interview (*see* 8 C.F.R. § 335.6).

8  Therefore, a plain reading of the regulatory language itself supports the conclusion that a 8 U.S.C. §

9  1447(b) "examination" is a process that does not trigger the 120-day adjudication period until the

10  entire process is complete.

11  Congress's prohibition of the adjudication of a naturalization application until a full

12  background check has been completed further supports USCIS's interpretation.  *See* Pub. L. 105-

13  119, Tit. I, Nov. 26, 1997, 111 Stat. 2448.  Congress made clear its determination that an

14  "examination" is not completed until interviews, investigations, and background checks are

15  completed.  *Id.*  Only then does the 120-day period in Section 1447(b) begin to run.  In other words,

16  Congress did not allow for courts to take over the naturalization adjudication process until USCIS

17  has compiled a complete record, including background checks.  *Cf., e.g., United States v. Am.*

18  *Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (statutory interpretation must avoid unreasonable, futile,

19  or absurd results).

20  
21  Other jurisdictions have recognized that an oral interview does not trigger the 120-day period

22  before which USCIS must grant or deny an application.  In *Martinez v. Gonzales,* 463 F.Supp.2d

23  569, 572-3 (N.D. Va. 2006), the court concluded that the 120-day period under 8 U.S.C. § 1447(b)

24  does not begin to run until USCIS receives the results of a completed background check.  *See also*,

25  *Damra v. Chertoff*, 2006 WL 1786246 (N.D. Ohio 2006); *El Kassemi v. DHS*, 2006 WL 2938819

26  (D. N.J.) (No jurisdiction because issue was not ripe for review); *Danilov v. Aguirre*, 370 F.Supp.2d

27  441, 443-44 (E.D. Va. 2005) (same); *Alkenani v. Barrows*, 356 F.Supp.2d 652 (N.D. Tex. 2005)

28  (dismissal without prejudice).  Naturalization interviews alone, which address only some of the

naturalization requirements (such as English language, and American government and history

proficiency, 8 C.F.R. §§ 312.1-312.5, *i.e.* "part of the overall examination process") do not initiate the 120-day period in Section 1447(b).  *See Martinez*, 463 F. Supp. 2d at 571.  Rather, the examination referenced in Section 1447(b) is "not simply a discrete, one-time event," but is instead, "an ongoing process by which CIS gathers information about an applicant for citizenship," as part of the examination process, "as is the FBI background check."  *Id.* at 571-72.  Hence, since the 120 period does not begin to run until all aspects of the examination process are completed, the Court lacks subject matter jurisdiction over this case.

Since the required security checks (that are without a statutory time restriction) have not been completed, (1) the time allowed by law for the USCIS to adjudicate an application has not yet expired and (2) this Court lacks subject matter jurisdiction.  *See* 8 U.S.C. § 1447(b).  As such, this Court should dismiss Count One.

### 2. Alternatively, The Court Should Remand The Individual Plaintiffs' Claims To USCIS Because The Court May Not Grant Citizenship Without The Benefit Of A Full And Complete Background Investigation.

Even if the Court finds jurisdiction pursuant to 8 U.S.C. § 1447(b), there is nothing in the statutory framework that compels USCIS to adjudicate a naturalization petition within 120 days.  Rather, when USCIS fails to do so, "[t]he district court assumes jurisdiction over the matter and may either determine the matter or remand it, with appropriate instructions, to USCIS."  *Astafieva v. Gonzales*, 2007 U.S. Dist. Lexis 5906 (N.D. Cal. 2007) (citing *El-Daour v. Chertoff*, 417 F. Supp. 2d 679, 681-83 (W.D. Pa. 2005).[4]  Therefore, should this Court obtain jurisdiction over a naturalization application, there is no obligation on its part to do more than remand it back to the agency.

If this Court assumes jurisdiction over Plaintiffs' claims, the Government respectfully submits that the Court may not order Plaintiff naturalized while background checks remain pending.  Rather, for the reasons stated below, the Court must remand Plaintiff's case to USCIS so his background investigation may be completed prior to adjudication.  As previously stated, USCIS is

---

[4] *But see, Astafieva v. Gonzales*, 2007 U.S. Dist. LEXIS 28993 (N.D. Cal.  2007) (granting application for naturalization after the FBI did not complete its name check within the sixty-days provided by the court, and where the court found no information to prevent Plaintiff's naturalization after Defendants' *in camera* presentation of evidence the court's review of partially redacted records obtained by Plaintiff through FOIA).

1   required to conduct a full criminal background check before an application can be adjudicated.  *See*

2   Pub. L. No. 105-119, Title I, 111 Stat. 2448 (Nov. 26, 1997);  8 C.F.R. § 335.2(b).  This Court in

3   *Astafieva* noted that "a majority of courts have declined to make an immediate determination of the

4   plaintiff's naturalization application," because,

> Congress intended that an FBI background check should be completed prior to
> the adjudication of each naturalization application, and the courts are 'not
> equipped to conduct the kind of investigation required to determine whether
> an applicant presents a risk to national security or public safety.

*Astafieva*, 2007 U.S. Dist. LEXIS 5906, * 6 (citing *Aslam v. Gonzales*, 2006 U.S. Dist. LEXIS

91747, *6 (W.D. Wash. 2006); *El-Daour*, 417 F. Supp. 2d at 684; *Essa v. U.S. Citizenship &*

*Immigration Serv.*, 2005 U.S. Dist. LEXIS 388803, *8 (D. Minn. 2005); *Toyomkina v. Gonzalez*,

2006 U.S. Dist. LEXIS 80845, *3 (W.D. Wash. 2006)).

    Therefore, similar to *Astafieva*, this Court should remand Plaintiffs' applications to USCIS

with instructions to complete the background security checks and adjudicate the naturalization

application as quickly as possible, but without further instructions.

    Given the complex nature of the name check investigations, any deadline for the conclusion

of the naturalization investigation, completion of the name checks, or completion of the

adjudication process might well undermine the compelling governmental interests in the Nation's

security and moral fitness of its citizenry.  *See e.g., Astafieva*, 2007 U.S. Dist. LEXIS 5906, * 6; *El-*

*Daour v. Chertoff*, 417 F. Supp 2d 679 (W.D. Pa. 2005);  *Essa,* U.S. Dist. LEXIS 388803, *8.  This

is so because of the reasonable possibility that there exists information relating to the plaintiffs

which undermines their claims to citizenship.  *See* Cannon Decl. at ¶¶ 17-19.  Limiting the time to

conduct such an evaluation may require USCIS or the FBI to cut short a promising lead in an

ongoing investigation.  As another court noted, "delays of this nature are inevitable and becoming

more frequent in light of heightened security concerns in the post-911 world." *Alkenani v. Barrows*,

356 F. Supp. 2d 652, 657 (N.D. Tex. 2005).

    In addition, the Supreme Court has recognized that "judicial deference to the Executive

Branch is especially appropriate in the immigration context."  *INS v. Aguirre-Aguirre*, 526 U.S. 415,

425 (1999).  In this case, deference should result in the Court's remanding the case and giving

USCIS the broadest possible latitude in adjudicating the naturalization applications.  Should

1   plaintiffs be dissatisfied with the resulting USCIS decision, they may individually return to the

2   Court for a *de novo* determination, after exhausting administrative remedies.  8 U.S.C. § 1421(c).  In

3   that event, the Court will have the benefit of a reasoned adjudication based upon a complete record,

4   including the results of the FBI checks.  In other words, the Court should permit USCIS to complete

5   the required investigations, to create records on which any review of its decisions, if necessary,

6   could be based, and to adjudicate the individual Plaintiffs' applications.

7                    **3.  Plaintiffs' Claims Are Improperly Joined.**

8             Should the Court not defer to USCIS's reasonable interpretation of the statute, nor remand

9   the individual matters to USCIS for completion of the individual examinations and adjudication, the

10  Court must hold individual hearings for each named plaintiff.  If the Court determines that such

11  individual hearings are necessary, the Court should sever the individual plaintiffs under Fed.  R.

12  Civ. P. 21.  *See Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997) (finding joinder

13  inappropriate due to unique nature of each application).  In determining whether severance is

14  appropriate, a court considers:  (1) whether the claims arise out of the same transaction or

15  occurrence; (2) whether the claims present common questions of law or fact; and (3) whether

16  prejudice to a substantial right would be avoided if severance was granted.  *Id.* (Severance

17  appropriate where each Plaintiff suffered a different duration of alleged delay, there might have

18  been numerous reasons for the alleged delay, where Plaintiffs did not allege that Defendants

19  engaged in a policy of delay, and where undue delay in one case may not have been undue delay in

20  another case.)  Here, no substantial rights of the plaintiffs would be prejudiced by severance.  Like

21  in *Coughlin*, Plaintiffs' claims do not arise out of the same transaction or occurrence.  Rather, each

22  application is filed separately and is independent from another.  Moreover, the reasons for the time

23  necessary to complete adjudication in one case may by different in another case, and therefore the

24  claims do not involve common questions of law or fact.  *Id.*  Plaintiffs would not be prejudiced by

25  severance, as they would continue to receive the individual hearing envisioned under 8 U.S.C. §

26  1447(b).

27          **B.      Plaintiffs' Count Two Fails to State a Claim for Which Relief Can be Granted
                      Pursuant to the Administrative Procedures Act**

28          The present controversy is not amenable to resolution under the Administrative Procedures

Act ("APA") and Plaintiffs' Count Two fails to state a claim, and should therefore be dismissed.[5]
Judicial review is unavailable under the APA because the agency actions Plaintiffs' seek review of
are not final agency actions.  The APA, by its terms, provides a right to judicial review of all "final
agency actions for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Here, there
an adequate remedy at law under 8 U.S.C. § 1447(b).  Even if the Court finds that Section 1447(b)
is inapplicable or does not provide an adequate remedy, judicial review under the APA is
unavailable because the actions for which Plaintiffs seeks review are not final, and there is no
legally required deadline for the completion of name checks or naturalization adjudications.

### 1. Plaintiffs Cannot Seek Judicial Review Under The APA Because 8 U.S.C. § 1447(b) Is The Only Statute Under Which Such A Claim Can Be Asserted, And It Provides An Adequate Remedy In A Court.

Plaintiffs cannot prevail on their APA claim alleging that Defendants have unlawfully
withheld or unreasonably delayed adjudication of their applications because 8 U.S.C. § 1447(b),
which deals specifically with naturalization applications and the time necessary to complete
adjudication, is the only statute under which such a claim can be asserted.  *See United States v.
Fausto*, 484 U.S. 439, 448-49 (1988) (general grants of jurisdiction cannot be relied upon in the face
of a specific statute that confers and conditions jurisdiction); *Danilov*, 370 F. Supp. 2d at 445
(finding APA inapplicable to claim that naturalization adjudication delayed in light of 8 U.S.C. §
1447(b)).  Section 1447(b) provides that the applicant may apply to the appropriate district court for
a hearing on the naturalization application if USCIS does not grant or deny the application by "the
end of the 120-day period after the date on which the examination is conducted under such section."
In such a case, the court "may either determine the matter or remand the matter, with appropriate
instructions, to [USCIS] to determine the matter."  8 U.S.C. § 1447(b).  Where Congress
specifically provided district court jurisdiction over naturalization applications 120-days after the

---

[5] To the extent that Plaintiffs claim jurisdiction on the basis of the Declaratory Judgment
Act, 28 U.S.C. § 2201, that statute does not provide an independent basis for subject matter
jurisdiction; it only creates a particular kind of remedy available in actions where the district
court already has jurisdiction to entertain a suit.  *Skelly Oil Co. v. Phillips Petroleum Co.,* 339
U.S. 667, 671-72 (1950); *Jarrett v. Roser,* 426 F.2d 213, 216 (9th Cir. 1970).  Thus, to be
eligible for declaratory relief, plaintiffs must first establish jurisdiction under an independent
basis. *Skelly Oil Co.,* 339 U.S. at 671-672  As discussed above, plaintiffs have failed to
otherwise establish jurisdiction; accordingly, the Declaratory Judgment Act is not applicable.

completion of USCIS's examination, any other basis of jurisdiction would contradict Congressional intent.

### 2. Plaintiffs Cannot Seek Judicial Review Under The APA Because Defendants' Actions Are Not "Final Agency Actions."

In order for an action to be final, and thus reviewable pursuant to the APA, the action must 1) "mark the 'consummation' of the agency's decision-making process," and 2) the action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

With regard to the first prong, the question courts ask is whether the agency "has rendered its last word on the matter." *Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 984 (9th Cir 2006) (citing *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001)). With regard to a naturalization application, the last word or final action is the adjudication of that application. No adjudication may take place without completion of background investigation. *See* Pub. L. No. 105-119, Title I, 111 Stat. 2448 (Nov. 26, 1997); 8 C.F.R. § 335.2(b). For each of the named plaintiffs, USCIS has not yet completed the background investigation. Even for those Plaintiffs whose name checks have been completed by the FBI, the completion of the name check by the FBI does not determine a right or create an obligation, and no legal consequences flow from the FBI's completion of the name checks.

### 3. Plaintiffs Cannot Seek Judicial Review Under The APA Where Defendants' Actions Are Not Legally Required.

Where there is no legally required deadline for the completion of adjudication nor any specific requirements regarding the tracking of cases, this Court should dismiss Plaintiffs' unreasonable delay claim. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("SUWA"); *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1110 (9th Cir. 2006) (holding that "a 'failure to regulate' claim must be based upon a clearly imposed duty to take some discrete action.")

In *SUWA*, the Supreme Court examined, among other things, the "limits the APA places on judicial review of agency inaction." *SUWA*, 524 U.S. at 61. Discussing 5 U.S.C. § 706(1), the Court held that "the only agency action that can be compelled under the APA is action legally *required*." *Id.* at 63 (emphasis in original). The Court also specifically noted that "a delay cannot be unreasonable with respect to action that is not required." *Id.* at 64, n.1; *see also San Francisco*

1   *Baykeeper v. Whitman*, 297 F.3d 877, 885-86 (9th Cir. 2002) (finding there could be no

2   "unreasonable delay" under the APA where EPA did not have a present statutory duty to act).  The

3   Court thus held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an

4   agency failed to take a *discrete* agency action that it is *required to take*[,]" and, further, that "[t]he

5   limitation to *required* agency action rules out judicial direction of even discrete agency action that is

6   not demanded by law."  *Id*. at 64-65.

7        Plaintiffs incorrectly rely on 8 U.S.C. § 1571(b) and 8 U.S.C. § 1447(b) as establishing

8   deadlines for agency action.  Nevertheless, the time periods mentioned in those statutes are not

9   expressed as commands to the agency, and neither statute creates a deadline for reasonableness.  *See*

10  8 U.S.C. §§ 1447(b), 1571(b).  Section 1447(b), for example, merely provides a jurisdictional basis

11  through which an individual can secure judicial review.  Given that a separate statute precludes

12  adjudication until the name checks are complete, it cannot be said that defendants are acting

13  unreasonably.  *See, e.g., Alkenani*, 356 F. Supp. 2d at 657 (not unreasonable to wait for results of

14  the name check).  Section 1571(b), by providing only the "sense" of the Congress, provides no

15  legally binding effect and, in any event, the large majority of applications for naturalization are

16  adjudicated within the six month period.  *See Yang v. California Dept. of Social Services*, 183 F.3d

17  953, 958 (9th Cir. 1999) (citing *Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987, 995

18  (1st Cir.1992) (holding that a sense of Congress provision neither required nor prohibited action by

19  the states or any other party and therefore "created no enforceable federal rights").

20       Even under the terms of the APA, the naturalization process has not been unreasonably

21  delayed because Congress has required name checks to be completed prior to action on a

22  naturalization application and has not provided any time limitation on completing that investigation.

23  Further, Congress has not enacted a time limit on acting on applications, it has only enacted a

24  jurisdictional provision allowing judicial review 120 days after the examination process is

25  complete.  None of the relevant statutes and regulations create a mandatory deadline for defendants

26  to act and the only relevant statute says that a naturalization application cannot be adjudicated until

27  the name check process has been completed.  Accordingly, the length of time that certain

28  individuals face pending adjudication of their naturalization applications is reasonable.

Furthermore, none of the relevant statutes and regulations mandate how Defendants should manage

1  the name check process nor the greater adjudicatory process for naturalization applications.

2  As a threshold matter, Plaintiffs have not, and indeed cannot, identify any statute that

3  imposes a mandatory duty upon the FBI to conduct background investigations in relation to

4  plaintiffs' applications for naturalization, let alone to complete such investigations within any

5  particular time frame. *See*, *e.g., Shalabi v. Gonzales*, 2006 WL 3032413, at *5 (E.D. Mo. Oct. 23,

6  2006) ("There is no statute or regulation which imposes a deadline for the FBI to complete a

7  criminal background check.").  In addition, the statute requiring that USCIS complete a criminal

8  background check -- which includes the name check -- does not contain any specific time frame for

9  the FBI's investigation regarding the requested name checks. *See* Pub. L. 105-119, Tit. I, Nov. 26,

10  1997, 111 Stat. 2448; see also *Mustafa v. Pasquerell*, 2006 WL 488399 at *5 (W.D. Tex. 2006)

11  (rejecting APA claim against USCIS to complete adjudication of immigration petition where "no

12  statute or regulation specifies a time period within which USCIS must act").[6]  Thus, no statutory or

13  regulatory authority limits the FBI's discretion in how it completes plaintiff's background check, let

14  alone how much time the FBI should allow for thoroughly completing this important task.

15  The extent of the FBI's discretion in conducting USCIS-requested name checks is

16  underscored by recent legislation seeking to reduce the length of personnel-related background

17  checks. *See, e.g.*, Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458,

18  § 3001(g), 118 Stat. 3638 (2004) (requiring the FBI to complete name checks regarding hiring

19  candidates within 60 days if practical to do so).  Had it wished to do so, Congress could have

20  imposed a duty upon the FBI to complete immigration name checks within a particular deadline, and

21  could have subjected this process to judicial review. *Cf. Haig v. Agee*, 453 U.S. 280, 300 (1981)

22

23  [6] Concerning the background investigation itself, independent of the time strictures, it is
well established that the courts generally have no power to order the Executive to undertake a

24  particular investigation absent some statutory provision conferring this authority. *See, e.g.*,
*United States v. Ramos*, 933 F.2d 968, 971 n.1 (11th Cir. 1991) (refusing request to order

25  investigation and holding that "[c]riminal investigations are an executive functions within the
exclusive prerogative of the Attorney General's office") (citing *United States v. Cox*, 342 F.2d

26  167, 190 (5th Cir. 1965); *Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375,
380 (2d Cir. 1973) (holding that courts cannot compel prosecutors to investigate or prosecute

27  alleged crimes); *Walker v. Schmoke*, 962 F. Supp. 732, 733 (D. Md. 1997) (noting that no federal
appellate court, including the Supreme Court (and the appellate courts, not the trial courts, make

28  legal policy) has recognized that there is a federally enforceable right for the victim to have
criminal charges investigated at all, let alone with vigor or competence.")

1 ("congressional acquiescence may sometimes be found from nothing more that silence in the face of

2 an administrative policy.") (citing *Zemel v. Rusk*, 381 U.S. 1, 11 (1965)).  *See also* Pub. Law 105-

3 515, 104 Stat. 2101, 2112 (1990) (the FBI may establish and collect fees to process name checks for

4 [certain non-criminal, non law enforcement and other purposes] but imposing no deadlines).

5                    **4.  The FBI's Procedures Do Not Violate the APA.**

6            Plaintiffs' APA claim against the FBI must fail because the time necessary to complete

7 background checks is not unreasonable.  *See Telecomm. Research Action Ctr. v. FCC*, 750 F.2d 70,

8 80 (D.C. Cir. 1984).  The backlog of name checks applies to a small number of the overall

9 applications for naturalization (less than 10 percent).  Cannon Decl. at ¶ 14.  In addition, defendants

10 must use limited resources to complete the background checks required not only for plaintiffs, but

11 also for other naturalization applicants and for other individuals.  Cannon Decl. at ¶ 4 (name checks

12 are performed for "Federal agencies, congressional committees, the Federal judiciary, friendly

13 foreign police and intelligence agencies, and state and local criminal justice agencies").  Because

14 USCIS has requested background checks in a broader range of circumstances post-9/11, a resource

15 strain has been placed on the FBI.  "[W]here resource allocation is the source of delay, courts have

16 declined to expedite action because of the impact of competing priorities." *Liberty Fund, Inc. v.*

17 *Chao*, 394 F. Supp. 2d 105, 117 (D.D.C. 2005).

18           Even in the face of a statutory deadline, moving some individuals to the front of the queue

19 has not been authorized by the courts because granting such relief for one group of petitioners

20 would simply move that group ahead of others who had also been waiting, resulting in no net gain in

21 processing.  *See In re Barr Lab.*, 930 F.2d 72, 75 (D.C. Cir. 1991); *Mashpee Wampanoag Tribal*

22 *Council, Inc. v. Norton*, 336 F.3d 1094, 1101 (D.C. Cir. 2003).  With limited resources, defendants

23 have prioritized the processing of name checks in a reasonable and entirely legal manner consistent

24 with the resources at their disposal.  *See Liberty Fund*, 394 F. Supp. 2d at 117; *In re Barr Lab*, 930

25 F.2d at 75; *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1101.  The nature and extent of the

26 interests at stake here also weigh heavily in favor of denying plaintiffs' request for a premature

27 decision on their applications. Plaintiffs' interest in an expedited decision is minimal and does not

28 implicate human health and welfare. Plaintiffs remain free to work and travel within the United

States. On the other hand, the FBI has an important national security interest in ensuring a thorough

1    and accurate result for plaintiffs' background checks.

2         Defendants also continue to address the backlog of background checks and have generally

3    been processing the backlog on a first-in, first-out basis.  Cannon Decl. at ¶¶ 19-20.  The time

4    necessary to complete name checks varies for a number of legitimate reasons.  *Id.* ¶ 20.  Courts have

5    been reluctant to find that such a process violates the undue delay standard.  *Liberty Fund*, 394 F.

6    Supp. 2d at 116-17 (denying such a claim against the Department of Labor for backlog processing of

7    employer applications for permanent labor certifications on behalf of aliens).  The FBI has also

8    shown that the large majority of name checks have been processed in a relatively short time frame

9    and that the agencies are faced with numerous competing priorities and limited resources in

10   processing name checks.  Under such circumstances, courts have been unwilling to find an APA

11   violation.

12        Therefore, Plaintiffs' Count Two fails to state and claim and should be dismissed because

13   the actions for which Plaintiffs seeks review are not final, and there is no legally required deadline

14   for the completion of name checks or naturalization adjudications.

15   **C.  USCIS's Longstanding Investigation Requirements Do Not Violate The APA's
     Notice-and-Comment Requirements.**

16

17        Plaintiffs argue that Defendants violated the APA by enacting an internal rule in November,

     2002, when the scope of the file search during the name check process was expanded to include
18
     both "references," and "main files," without giving the public notice or the opportunity for the
19
     public to comment.  Contrary to Plaintiffs' assertions, the APA does not require administrative
20
     agencies to follow notice and comment procedures in all situations.  Rather, 5 U.S.C. § 553(b)(3)
21
     specifically exempts "interpretive rules, general statements of policy, or rules of agency
22
     organization, procedure, or practice" from the requirement.  Because the November 2002 internal
23
     rule was an interpretive rule, this Court should dismiss Count Three.
24
          Ninth Circuit jurisprudence defines such interpretive rules as "hortatory and instructional"
25
     things which "merely clarify or explain existing law or regulations."  *Alcaraz v. Block*, 746 F.2d
26
     593, 614 (9th Cir. 1984) (citing *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983)); *see*
27
     *also Linoz v. Heckler*, 800 F.2d 871, 877 (9th Cir. 1986) (superceded on other grounds).  Because
28
     interpretative rules only "clarify or explain existing law," they are "not subject to the rigors of the

1  APA," and do not require notice and comment.  *Gunderson v. Hood*, 268 F.3d 1149, 1155 (9th Cir.

2  2001).  The fact that an interpretative rule has some substantial impact does not make the rule

3  subject to notice and comment.  *Alcaraz*, 746 F.2d at 614 (9th Cir. 1984) (citing *Rivera v. Becerra*,

4  714 F.2d 887, 890 (9th Cir. 1983)).

5        Here, Defendants' November 2002 expansion of the scope of the files searched in response

6  to a request for a name check is an action that is equivalent to an interpretative rule or agency

7  procedure because the action only served to modify the scope of the "full criminal background

8  check."   The actual requirement of a the name check portion of the "full criminal background

9  check" was unchanged.

10        The name check requirement itself is not new.  The INS long considered police department

11  checks and background investigation as part of the examination of naturalization applicants.  *See*

12  Administrative Naturalization, 56 Fed. Reg. 50,475 (Oct. 7, 1991) (codified at 8 C.F.R. § 335.1)

13  (requiring that "the investigation shall consist, at a minimum, of a review of all pertinent records,

14  police department checks, and a neighborhood investigation. . .").  Congress codified this policy

15  into statute in 1997 with the passage of 8 U.S.C. § 1446(a), which prohibited the use of

16  Congressional appropriations to "complete adjudication of an application for naturalization," prior

17  to receipt of confirmation from the FBI that a "full criminal background check has been completed."

18  USCIS promulgated regulations based on this act of congress through an interim final regulation,

19  published March 17, 1998.  *See* Fingerprinting Applicants and Petitioners for Immigration Benefits;

20  Establishing a Fee for Fingerprinting by the Service; Requiring Completion of Criminal Background

21  Checks Before Final Adjudication of Naturalization Applications, 63 Fed. Reg. 12,987 (March 17,

22  1998) (codified at 8 C.F.R. § 335.2(b)) (requiring completion of criminal background checks before

23  examination).  In November 2002, as a result of the terrorist attacks of September 11, 2001, the

24  defendants expanded the scope of the files searched in response to a name check request to

25  encompass a broader range of information by accessing both "main files," and "references."

26  Cannon Decl. at ¶ 17.

27        As a result, plaintiffs' assertion of a violation of the APA's notice and comment procedure

28  has no basis in law, and Count Three should be dismissed.

**D. The Court Should Dismiss The Request For Injunctive Relief.**

An injunction is a "'harsh and drastic' discretionary remedy, never an absolute right." *Abend v. MCA, Inc.*, 863 F.2d 1465, 1478 (9th Cir. 1988), and a federal judge is not obligated to issue an injunction for every violation of law. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 192 (2000). To qualify for injunctive relief, the class members must demonstrate that they will sustain irreparable injury and that remedies at law are inadequate. *Walters v. Reno,* 143 F.3d 1032, 1048 (9th Cir. 1998) (citing *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990). "In order to meet this standard, the plaintiffs must establish actual success on the merits, and that the balance of equities favors injunctive relief." *Id.; see also Amoco Prod. Co. v. Vill. Of Gambell, Alaska*, 480 U.S. 531, 542 (1987). Here, plaintiffs have failed to establish any of the prerequisites for the issuance of a permanent injunction.

As a threshold matter, an adequate remedy at law already exists. 8 U.S.C. § 1447(b) provides a remedy for those whose applications have been allegedly been pending for over 120 days after completion of the naturalization examination. Moreover, this remedy at law, repeatedly and successfully used by plaintiffs throughout the United States, is readily available and accessible to others. Instructions on how to bring such actions are readily available on the internet (*i.e.*, American Immigration Law Foundation, http://www.ailf.org/lac/lac_pa_100605.pdf) and provide, with clear and concise detail, instructions on seeking relief.

Furthermore, no irreparable injury is proximately related to Defendants' action because "[n]o alien has the slightest right to naturalization unless all statutory requirements are complied with . . . ." *United States v. Ginsburg*, 243 U.S. 472, 475 (1917); *see also Federenko v. U.S.*, 449 U.S. 490, 506 (1981). The law requires USCIS to take no action on Plaintiffs' applications prior to receipt of the final reports of the security background check. Because Plaintiffs do not have a right to naturalization, it cannot be shown that Plaintiffs have suffered irreparable injury as a result of the time necessary for Defendants to complete the adjudication of Plaintiffs' naturalization applications.

Finally, the public interest is always a factor to be considered in the granting of an injunction. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 326-27 (1982). Here, particularly in light of heightened security concerns in the post-September 11, 2001, world, as well as the

1   importance of the benefit sought, it would not be in the public interest to order the FBI or USCIS at

2   this point to rush through these applications or to limit their investigations to a specific duration.

3   Limiting the time to conduct an FBI investigation may require the FBI to cut short a promising lead

4   in an ongoing investigation relating to a terrorist or criminal group, and may require the FBI to

5   channel resources in a way that limits its ability to conduct other investigations.  The weight of

6   plaintiffs' arguments regarding public interest are lessened by the fact that they have the benefits of

7   lawful permanent resident status, including the ability to work and travel.  Thus, the public interest

8   clearly weighs against plaintiffs' request for an mandatory permanent injunction.  Therefore, this

9   Court should dismiss Plaintiffs' request for declaratory and injunctive relief with regard to Counts

10  Two through Four.

11       **E.  The Court Should Dismiss Plaintiffs' Due Process Claim Because Plaintiff
             Does Not Assert A Protected Interest.**

12       Plaintiffs allege that Defendants Sill, Gonzalez, and Chertoff have "a pattern, practice, or

13  policy of failing to adjudicate the applications for naturalization of the proposed plaintiff class

14  within 120 days of the date of naturalization examinations because of the time necessary to

15  complete 'name checks,'" that such actions violate 8 U.S.C. § 1446(d) and 8 C.F.R. § 335, and

16  therefore violate Plaintiffs' rights to due process by law.  Plaintiffs make the same allegations with

17  regard to Defendants' failure "to set deadlines for completing 'name checks' and to take all other

18  reasonable steps necessary to complete the adjudication of applications for naturalization of the

19  proposed plaintiff class."

20       As a threshold requirement to any due process claim, however, every plaintiff must show

21  that he has a protected liberty interest.  *See Board of Regents v. Roth*, 408 U.S. 564, 569 (1972)

22  ("[t]he requirement of procedural due process apply only to the deprivation of interests

23  encompassed by the [Due Process Clause's] protection of liberty and property"); *Nunez v. City of

24  Los Angeles,* 147 F.3d 867, 871 (9th Cir. 1998) (due process claimant "must, as a threshold matter,

25  show government deprivation of life, liberty, or property").  To have a protectable property or

26  liberty interest in a benefit, "a person clearly must have more than an abstract need or desire for it.

27  He must have more than a unilateral expectation of it.  He must have, instead, have a legitimate claim of

28  entitlement to it." *Roth*, 408 U.S. at 577; *Roberts v. Spaulding*, 783 F.2d 867, 870 (9th Cir. 1986)

("A mere expectation of receiving a benefit is not enough to create a protected interest"); *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002) (If a statute does not "mandate a particular outcome," there is no legitimate claim of entitlement and, hence, no liberty interest).  Here, Plaintiffs fail to identify a any protected interest in their ability to naturalize because "[n]o alien has the slightest right to naturalization unless all statutory requirements are complied with . . . ." *Ginsburg*, 243 U.S. at 475.  One such statutory requirement is the completion of background investigations, which is ongoing for all named Plaintiffs.

Additionally, the Supreme Court has clearly ruled that the statutory grant of a procedural right cannot itself give rise to a liberty interest.  First, the only procedure provided for Plaintiffs is the ability to seek district court jurisdiction over their naturalization applications if USCIS has not completed their adjudication more than 120 days after the examination is complete. 8 U.S.C. § 1447(b).  Even if this court finds that it has jurisdiction pursuant to 8 U.S.C. § 1447(b), Defendants have not violated such procedure, nor does such procedure give rise to a protected interest.  See *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 280 n.2 (1998); *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) (an "expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause"); *FDIC v. Henderson*, 940 F.2d 465, 475 (9th Cir. 1991) ("[A] substantive property right cannot exist exclusively by virtue of a procedural right").  Where there is no protected interest in Plaintiffs' ability to naturalize, the mere fact that the INS provides for a naturalization procedure does not create a protected interest in the ability to naturalize, and this Court should dismiss Count Four.

## CONCLUSION

Plaintiffs First Amended Complaint should be dismissed for lack of jurisdiction in part, and for failure to state a claim in part.  In the alternative, the Court should find that Plaintiffs' claims under 8 U.S.C. § 1447(b) are improperly joined, and to the extent that this Court takes any action, it should at most remand the individual cases to the USCIS without instructions.

1

Respectfully submitted,

2

3                                       SCOTT N. SCHOOLS
                                       United States Attorney
                                       JOANN M. SWANSON

4                                         Assistant United States Attorney
                                       Chief, Civil Division

5                                         EDWARD A. OLSEN
                                       Assistant United States Attorney

6

7                                         PETER D. KEISLER
                                       United States Department of Justice

8                                         Assistant Attorney General, Civil Division
                                       DAVID KLINE

9                                         Principal Deputy Director
                                       Office of Immigration Litigation

10                                       ELIZABETH J. STEVENS
                                       Trial Attorney

11

12  Dated: April 30, 2007                  By:    /s/
                                          JEFFREY S. ROBINS

13                                          Trial Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Case No. C-07-0503-SBA

I hereby certify that on this 30th day of April 2007, one copy of the foregoing ***Notice of Appearance*** was served on counsel for Plaintiffs via the district court ECF system which will send notification of such filing to the following ECF filers:

Julia Harumi Mass
jmass@aclu.org
Alan L. Schlosser
aschlosser@aclu.org
Cecilia D. Wang
cwang@aclu.org
ACLU Foundation of Northern California
Lucas Guttentag
lguttentag@aclu.org
ACLU Immigrants' Rights Project
Christopher Joren Lyons
joren@asianlawcaucus.org
Asian Law Caucus
Edward A. Olsen
edward.olsen@usdoj.gov
United States Attorney's Office
Elizabeth J. Stevens
Elizabeth.Stevens@usdoj.gov
Department of Justice, Office of Immigration Litigation

In addition, I hereby certify that on this 30th day of April 2007, true and correct copies of the NOTICE OF APPEARANCE were served by Federal Express next-day delivery on the following non-ECF filers:

Sin Yen Ling                           Todd Gallinger
Asian Law Caucus                       Council on American-Islamic Relations (CAIR)
939 Market Street, Suite 201           3000 Scott Boulevard, Suite 212
San Francisco, CA 94103                Santa Clara, CA 95054

_____
JEFFREY S. ROBINS
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
Post Office Box 878, Ben Franklin Station
Washington, D.C. 20044

1
2
3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

4   YINAN ZHANG,
            et al.
5
        Plaintiff,
6
        v.                                        Case No:
7                                                 07-CV-0503-JL
    DAVID STILL,
8            et al.,
9       Defendants.

10

11          **DECLARATION OF MICHAEL A. CANNON**

12      Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

13          (1)    I am currently the Section Chief of the National Name Check Program

14  Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C.

15  I have held that position since March 7, 2005.

16          (2)    In my current capacity as Section Chief, I supervise the National Name

17  Check Units. The statements contained in this declaration are based upon my personal

18  knowledge, upon information provided to me in my official capacity, and upon conclusions and

19  determinations reached and made in accordance therewith.

20          (3)    Due to the nature of my official duties, I am familiar with the procedures

21  followed by the FBI in responding to requests for information from its files pursuant to the policy

22  and the procedures of the United States Citizenship and Immigration Services ("USCIS").

23  Specifically, I am aware of the name check requests for plaintiffs Yinan Zhang, Alia Ahmedi,

24  Zhong Fu, Abdul Ghafoor, Miao Ling Huang, Sana Jalili, Yan Wang, and Yan Yin.

25          **NATIONAL NAME CHECK PROGRAM**

26          (4)    The National Name Check Program ("Program") has the mission of

27  disseminating information from the FBI's Central Records System in response to requests

28  submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

1   police and intelligence agencies; and state and local criminal justice agencies. The Central
2   Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.
3   The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower
4   Administration. That executive order addresses personnel security issues and mandates National
5   Agency Checks as part of the pre-employment vetting and background investigation process for
6   prospective Government employees. The FBI performs the primary National Agency Check
7   conducted on all United States Government employees. From this modest beginning, the
8   Program has grown exponentially, with more and more customers seeking background
9   information from FBI files on individuals before bestowing a privilege, such as Government
10  employment or an appointment, a security clearance, attendance at a White House function, a
11  "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and
12  local agencies regularly request FBI name searches. In addition to serving our regular
13  Government customers, the FBI conducts numerous name searches in direct support of the FBI's
14  counterintelligence, counterterrorism, and homeland security efforts.

15                    **EXPLANATION OF THE CENTRAL RECORDS SYSTEM**

16          (5)     The FBI's CRS enables the FBI to maintain all information which it has
17  acquired in the course of fulfilling mandated law enforcement responsibilities. The records
18  maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files
19  compiled for law enforcement purposes. This system consists of a numerical sequence of files
20  broken down according to subject matter. The subject matter of a file may relate to an
21  individual, organization, company, publication, activity, or foreign intelligence matter. Certain
22  records in the system are maintained at FBI Headquarters. Records which are pertinent to
23  specific FBI Field Offices are mostly maintained at those Field Offices.

24          (6)     FBI Headquarters and each Field Division can access the CRS through the
25  FBI's General Indices. The General Indices are arranged in alphabetical order and consist of
26  indices on various subjects, including the names of individuals and organizations. Only the
27  information considered pertinent, relevant, or essential for future retrieval is indexed.

28
                                        2

1        (7)     Communications directed to FBI Headquarters from various Field Offices

2   and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,

3   groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

4   victims. Searches made in the index to locate records concerning particular subjects are made by

5   searching the name of the subject requested in the index.

6        (8)     The entries in the General Indices fall into two categories:

7               (a)    "main" entries – entries that carry the name corresponding
                         with the subject of a file contained in the CRS.

8

9               (b)    "reference" entries – entries (sometimes called "cross-
                         references") that generally only mention or reference an
                         individual, organization, etc., that is contained in a

10                         document located in another "main" file.

11        (9)     In 1995, the FBI implemented the Automated Case Support ("ACS")

12   system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records

13   were converted from automated systems previously utilized by the FBI. The ACS system

14   consists of the following three automated applications that support case management functions

15   for all investigative and administrative cases:

16               (a)    Investigative Case Management: This application provides
                         the ability to open, assign, and close investigative and

17                         administrative cases as well as to set, assign, and track
                         leads. A case is opened by the Office of Origin, which sets

18                         leads for itself and other field offices, as needed. The
                         offices that receive the leads are referred to as Lead Offices.

19                         When a case is opened, it is assigned a Universal Case File

20                         Number, which is utilized by FBI Headquarters and all
                         offices conducting or assisting in the investigation. Using

21                         fictitious file number "111-HQ-12345" as an example, an
                         explanation of the Universal Case File Number is as

22                         follows: "111" indicates the classification for that specific
                         type of investigation; "HQ" is the abbreviated form used for

23                         the Office of Origin of the investigation (in this case, FBI
                         Headquarters); and "12345" indicates the individual case
                         file number for that particular investigation.

24

25               (b)    Electronic Case File: This application serves as the central
                         electronic repository for the FBI's official text-based

26                         documents. It supports the universal serial concept, where
                         only the creator of a document serializes it into a file,

27                         providing single source entry of serials into the

28

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)    Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.2 million records, functions to index names to cases; and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

1     reasons to explain why an FBI Special Agent conducting an investigation believed it important to

2     include a particular name in the FBI's index for later recovery. The names are searched in a

3     multitude of combinations, switching the order of first, last, and middle names, as well as

4     combinations with only the first and last names, first and middle names, and so on. The Program

5     application searches names phonetically against the Universal Index records and retrieves similar

6     spelling variations (which is especially important considering that many names in our indices

7     have been transliterated from a language other than English).

8           (12)   If there is a match with a name in a FBI record, it is designated as a "Hit,"

9     meaning that the system has stopped on a possible match with the name being checked. If a

10    search comes up with a match to a name and either a birth date or social security number, it is

11    designated an "Ident."

12                            **RESOLUTION RATE**

13           (13)   Historically, approximately 68 percent of the name checks submitted by

14    USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72

15    hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable

16    information regarding a particular individual. Duplicate submissions (i.e., identically spelled

17    names with identical dates of birth and other identical information submitted while the original

18    submission is still pending) are not checked, and the duplicate findings are returned to USCIS

19    within 48-72 hours.

20           (14)   For the name check requests that are still pending after the initial

21    electronic check, additional review is required. A secondary manual name search completed

22    typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests

23    as having "No Record," for a 90 percent overall "No Record" response rate. The results of this

24    22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being

25    the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the

26    record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can

27    be reviewed quickly. If not, however, the relevant information must be retrieved from an

28

1  existing paper record. Review of this information will determine whether the information is

2  identified with the request. If the information is not identified with the request, the request is

3  closed as a "No Record" and USCIS is so notified.

4          (15)  Once a record is retrieved, the FBI reviews the file for possible derogatory

5  information. Less than one percent of USCIS's requests are identified with a file containing

6  possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory

7  information to USCIS.

8                        **GROWTH OF THE NAME CHECK PROGRAM**

9          (16)  Prior to September 11, 2001, the FBI processed approximately 2.5 million

10  name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the

11  number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4

12  million name checks.

13                        **USCIS NAME CHECK REQUESTS**

14          (17)  In November 2002, heightened national security concerns prompted a

15  review of the former Immigration and Naturalization Service's ("INS's") procedures for

16  investigating the backgrounds of individuals seeking immigration benefits. It was determined

17  that deeper, more detailed clearance procedures were required to protect the people and the

18  interests of the United States effectively. One of the procedures identified was the FBI's name

19  check clearance. Before November 2002, only those "main" files that could be positively

20  identified with an individual were considered responsive to the immigration authorities name

21  check requests. However, because that approach ran a risk of missing a match to a possible

22  derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a

23  processing standpoint, this meant the FBI was required to review many more files in response to

24  each individual background check request.

25          (18)  In December of 2002 and January of 2003, the former INS resubmitted 2.7

26  million name check requests to the FBI for background investigations of all individuals with

27  then-pending applications for immigrations benefits for which the Immigration and Nationality

28

1   Act required background investigations. Those 2.7 million requests were in addition to the
2   regular submissions by the former INS. Currently, the FBI has returned an initial response to all
3   2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to
4   those resubmitted requests indicated that the FBI had no information relating to the specific
5   individual who was the subject of the request, approximately 16 percent -- or over 440,000 --
6   resubmitted requests indicated that the FBI may have information relating to the subject of the
7   inquiry. The FBI is still in the process of resolving those 440,000 requests.

8           (19)    The FBI's processing of those 440,000 resubmissions has delayed the
9   processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name
10  check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check
11  be expedited.

12          (20)    The FBI cannot provide a specific or general time frame for completing
13  any particular name check submitted by USCIS. The processing of name checks, including those
14  which are expedited, depends upon a number of factors, including where in the processing queue
15  the name check lies; the workload of the analyst processing the name check; the volume of
16  priority checks the analyst must process for, among others, military call-ups, medical
17  emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible
18  matches) that must be retrieved, reviewed and resolved; the number of records from various Field
19  Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and
20  resources available to conduct the checks. While the FBI is sensitive to the impact of the delays
21  in processing name check requests, the consequence of the FBI's mission on homeland security
22  requires that its name check process be primarily focused on providing accurate and thorough
23  results. When the name check is completed, the FBI provides the results to USCIS as quickly as
24  possible.

25          (21)    It is important to note that the FBI does not adjudicate applications for
26  benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a
27  summary of available information to USCIS for its adjudication process.

28

7

—

1

## PLAINTIFF'S NAME CHECK REQUEST

2     (22)    The name check request for plaintiff Yinan Zhang was received by the FBI

3  from USCIS on or about December 12, 2002, and was completed on February 28, 2007. The FBI

4  performed its check in response to USCIS's request in accordance with procedures outlined

5  above. The results of the name check were forwarded to USCIS in Washington, D.C., in due

6  course, in accordance with the FBI's normal protocol.

7     (23)    The name check request for plaintiff Alia Ahmedi was received by the FBI

8  from USCIS on or about December 8, 2002, and was completed on October 13, 2005. The FBI

9  performed its check in response to USCIS's request in accordance with procedures outlined

10  above. The results of the name check were forwarded to USCIS in Washington, D.C., in due

11  course, in accordance with the FBI's normal protocol.

12     (24)    The name check request for plaintiff Zhong Fu was received by the FBI

13  from USCIS on or about January 16, 2004, and was completed on March 22, 2007. The FBI

14  performed its check in response to USCIS's request in accordance with procedures outlined

15  above. The results of the name check were forwarded to USCIS in Washington, D.C., in due

16  course, in accordance with the FBI's normal protocol.

17     (25)    The name check request for plaintiff Abdul Ghafoor was received by the

18  FBI from USCIS on or about March 22, 2004, and has not been completed. The FBI is

19  performing its check in response to USCIS's request in accordance with procedures outlined

20  above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due

21  course, in accordance with the FBI's normal protocol.

22     (26)    The name check request for plaintiff Miao Ling Huang was received by

23  the FBI from USCIS on or about November 21, 2003, and was completed on March 6, 2007.

24  The FBI performed its check in response to USCIS's request in accordance with procedures

25  outlined above. The results of the name check were forwarded to USCIS in Washington, D.C., in

26  due course, in accordance with the FBI's normal protocol.

27

28

1       (27)   The name check request for plaintiff Sana Jalili was received by the FBI

2  from USCIS on or about January 15, 2004, and has not been completed. The FBI is performing

3  its check in response to USCIS's request in accordance with procedures outlined above. The

4  results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in

5  accordance with the FBI's normal protocol.

6       (28)   The name check request for plaintiff Yan Wang was received by the FBI

7  from USCIS on or about May 15, 2003, and has not been completed. The FBI is performing its

8  check in response to USCIS's request in accordance with procedures outlined above. The results

9  of the name check will be forwarded to USCIS in Washington, D.C., in due course, in

10  accordance with the FBI's normal protocol.

11       (29)   The name check request for plaintiff Yan Yin was received by the FBI

12  from USCIS on or about September 5, 2003, and has not been completed. The FBI is performing

13  its check in response to USCIS's request in accordance with procedures outlined above. The

14  results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in

15  accordance with the FBI's normal protocol.

16       (30)   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

17  foregoing is true and correct to the best of my knowledge and belief.

18      Executed this **30**th day of April 2007.

19

20

21  MICHAEL A. CANNON
    Section Chief
22  National Name Check Program Section
    Records Management Division
23  Federal Bureau of Investigation
    Washington, D.C.

24

25

26

27

28

*Press Office*
**U.S. Department of Homeland Security**



April 25, 2006

# Fact Sheet

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors.  Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—**  IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history.  Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.  The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

U.S. Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529



**U.S. Citizenship
and Immigration
Services**

# Interoffice Memorandum

HQ 70/35.2

TO:          Chief, Field Operations
             Regional Directors
             Field Office Directors
             District Directors, including Overseas Officers-in-Charge
             Associate Director, Refugee, Asylum, and International Operations

FROM:        Michael L. Aytes
             Associate Director, Domestic Operations

DATE:        March 23, 2007

RE:          Clarification Regarding the Notice to Naturalization Applicants

The current Form N-652, Naturalization Interview Results, was introduced in 2005 to facilitate
the notice District Adjudications Officers (DAOs) must provide to naturalization applicants
regarding their rights to appeal a naturalization denial or seek review in federal district court.
The Form N-652 revision was introduced in a memorandum from Terrance M. O'Reilly entitled
*Implementation of revised N-652, Naturalization Interview Results,* dated January 14, 2005. The
January 14, 2005 memorandum's use of the word "interview" in place of "examination" has
caused confusion and requires clarification. This memorandum supersedes the January 14, 2005
memorandum.

The current Form N-652, bearing a revision date of January 14, 2005, includes explicit notice of
applicant's rights under section 336 of the Immigration and Nationality Act in the event that the
application should be denied or that a decision on the case should not be completed within 120
days of the examination. The language in the Form N-652 provides adequate notice to applicants
as required by the statute.

When advising applicants orally of their rights, or answering applicants' questions regarding the
notice, it is important to clarify that Section 336(b) of the Immigration and Nationality Act
allows an applicant to request a hearing in federal district court when 120 days have passed from
the "examination". The "examination" is not a discrete event; i.e., the "interview", but rather a
process which could include issuance of subpoenas to compel attendance of witnesses and the
production of relevant papers, books, and documents, as well as the taking of testimony on any
matter impacting the admissibility of the applicant, and the resolution of the prescribed U.S.
Citizenship and Immigration Services (USCIS) security checks.

Page 2
Memo: Clarification Regarding the Notice to Naturalization Applicants

Under Public Law 105-199, 111 Stat. 2448-2449 (1997), USCIS cannot complete the adjudication of an application for naturalization unless [it] has received confirmation from the FBI that a full criminal background check has been completed. Although it is USCIS policy to schedule the interview only after the definitive background check responses have been received, issues relating to the background checks can still remain pending after an interview has been conducted.

The examination is an iterative process that involves file review, possible request for evidence, criminal arrest and charging documents, and security clearances. The examination described in section 336(b) of the Act occurs when all needed information has been obtained and when there are no further issues to be resolved after the interview.

Although the words "examination" and "interview" are sometimes mistakenly used interchangeably, it is important to note that Section 336(b) refers to "examination". The word "interview" nowhere appears in the pertinent statutory passages. Congress could have certainly used the word "interview" in Section 336(b), but chose not to. Congress in fact considered, but rejected, an amendment to Section 336(b) that would have included the word "interview".

DAOs are reminded that whenever a Form N-652 is issued, a duplicate must be placed in the applicant's record file. Such copies constitute an official record of the content of the notice issued to the applicant, and enable USCIS to verify that record when necessary.

Questions relating to this memorandum must be directed, through channels, to Gerard D. Casale, Field Liaison Branch, Office of Field Operations.

SCOTT N. SCHOOLS, SC 9990
United States Attorney
JOANN M. SWANSON, CSBN 88143
Assistant United States Attorney
Chief, Civil Division
EDWARD A. OLSEN, CSBN 214150
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-6915
FAX: (415) 436-6927

PETER D. KEISLER
United States Department of Justice
Assistant Attorney General, Civil Division
DAVID KLINE
Principal Deputy Director
Office of Immigration Litigation
ELIZABETH J. STEVENS VSBN 47445
Trial Attorney
Office of Immigration Litigation
JEFFREY S. ROBINS NY SBN 4355244
Trial Attorney

    P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-1246
FAX: (202) 233-0397
Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| YINAN ZHANG, et al., | ) No. C-07-0503-SBA |
| | ) |
|     Plaintiffs, | ) |
| | ) **[PROPOSED] ORDER** |
|     v. | ) |
| | ) |
| ALBERTO R. GONZALES, et al., | ) Date: July 31, 2007 |
| | ) Time: 1:00 p.m. |
|     Defendants.. | ) Courtroom: 3 |

    This matter came before the Court on Defendants' Motion to Dismiss the Plaintiff's First

Amended Complaint for Declaratory and Injunctive Relief and Petition for Naturalization Pursuant

to 8 U.S.C. § 1447(b) for lack of jurisdiction in part, and for failure to state a claim in part; and

alternatively, to find that Plaintiffs' claims under 8 U.S.C. § 1447(b) are improperly joined, and to remand the individual cases to the USCIS without instructions.

The Court has carefully considered the pleadings of record and:

_____ Grants Defendants' motion to dismiss the action for lack for jurisdiction in part, and for failure to state a claim in part.

_____ Grants Defendants' motion, finds that Plaintiffs' claims under 8 U.S.C. § 1447(b) are improperly joined, and remands the individual cases to the USCIS without instructions.

IT IS SO ORDERED.

Date: _____

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge